719 So.2d 1121 (1998)
STATE of Louisiana, Appellee,
v.
S.B., Jr. Appellant.
No. 31264-JAC.
Court of Appeal of Louisiana, Second Circuit.
September 25, 1998.
*1122 Indigent Defender Board by Tracy L. Short, Farmerville, for Appellant.
Richard Ieyoub, Attorney General, Robert W. Levy, District Attorney, Truett L. West, Assistant District Attorney, for Appellee.
Before MARVIN, C.J., and NORRIS and CARAWAY, JJ.
MARVIN, Chief Judge.
S.B., Jr., born in 1980, appeals his adjudication as a juvenile delinquent for having committed an armed robbery of a Farmerville, LA convenience store on July 22, 1997, and his being placed in the custody of the DOC until his 21st birthday.
The issue of S.B.'s identification by the robbery victim is raised in two argued assignments, the sufficiency of the evidence to convict beyond a reasonable doubt, and whether the line-up was "suggestive" as S.B. contended on his unsuccessful pre-trial motion to suppress a line-up. After a Crime-Stopper tip and two weeks after the robbery, the victim identified S.B. in the line-up, first by viewing the line-up and secondly and more definitely by having S.B. and another participant to say what had been said during the robbery. The juvenile judge who heard and denied the motion to suppress also presided at S.B.'s trial.
The above assignments arise primarily because the initial report of the police officer who investigated the robbery and viewed the surveillance videotape, and who conducted the later line up, revealed some discrepancies between the victim's description [eyes, height *1123 and weight] of the robber to the officer and the victim's testimony at trial.
The victim testified at the trial and was extensively cross-examined about what the officer reported she had said. She did not testify at the motion to suppress. Her testimony at trial obviously was accepted by the juvenile court.
Viewing the evidence in the light that most favorably supports the prosecution, we affirm.

FACTS
S.B.'s trial occurred November 27, 1997, about four months after the robbery and the line-up. The store clerk-robbery victim said the robbery occurred about 3:00 a.m. on July 22, 1997, at a Chevron downtown convenience store in Farmerville. A surveillance video camera in the store showed the date and elapsed time and the armed robbery, but not otherwise specifically show the identity of the robber, who wore a camouflaged ski mask, a dark sweatshirt and black pants and shoes.
The videotape corroborates Mrs. Nora Smith, the clerk-victim, who testified that she stood behind the counter and the cash register when she first noticed the robber as he entered the store and was within three or so feet of her: "... I heard him come in ... looked up and all I could see was the gun." She saw at trial for the first time and identified four sequential photos made from the video tape. She is shown in the photo bearing the time at 2:22:52 [a.m.]. The robber is shown in each photo. We reproduce the four sequential photos here:
*1124 
Mrs. Smith testified that she thought the time was after 3:00 a.m. instead of 2:00 a.m., explaining that she believed that the "time" on the video camera was "messed up or something." She described herself as being "scared to death" and said she focused on the barrel of the pistol the robber had in his hand and thereafter "noticed" or paid attention *1125 to the robber's movements, voice, eyes and mouth not covered by the ski mask.
Mrs. Smith said when the robber demanded her to "give him my money," she told him:
"... sir you don't want to do this. We've got cameras, you're gonna be caught ... and he said give me your money. Don't make me shoot you or I will shoot or something to that effect. And I said okay. I opened the drawer, give him the money and he left."
She estimated the elapsed time of the robbery as "... I don't know because I was scared to death ... I would assume twenty, thirty [seconds] no longer." Her assumption, of course, is less than the elapsed time shown on the videotape.
According to Mrs. Smith, the robber had a "distinct" voice. She testified "... his voice I would know anywhere [different, kind of low, kind of deep]" and he walked "kindly [sic] bent forward with his hiney [sic] stuck out." She said the robber was "not loud, did not [shout]. In fact, I could even say he was really nice about it. If you can call a robber nice."
Mrs. Smith stated at trial that S.B. had "white" in his eyes, while acknowledging that she had told the investigating police officer, J.D. Simpson, about 6:15 p.m. on the evening of the early a.m. robbery that the robber had a deep voice, extremely large eyes and that she didn't see any white, his eyes being "completely one color ... clear brown ... glassy." She explained, obviously to the satisfaction of the trial court, this discrepancy and how she came to identify S.B. at the line-up conducted about two weeks after the robbery: "I didn't notice any [white]. But as scared as I wasbut I did notice they were brown, a clear brown.... To the best of my knowledge [his eyes were completely brown]. But like I said, I was scared to death. I was looking down the barrel of a gun." When asked what she meant when she told Officer Simpson "there was no white in his eyes," she answered, "I just didn't notice any white.... His voice [at the line up] `drew me to recall this person ...'."

Crime Stoppers Evidence
Crime Stoppers publicized the robbery, apparently soliciting evidence and identity of the perpetrator. About two weeks after the robbery a confidential informer responded to the solicitation by telephone and stating that S.B. had "confessed" the robbery to the caller and had told the caller where the mask and some of the clothing worn in the robbery could be found. Officer Simpson and Chief of Police found the items where the CI stated.
Simpson then caused Mrs. Smith to view a formal line up witnessed by three others and S.B.'s father. The line up on August 7, 1997, included S.B. and four others who were generally of similar size and weight, all in similar clothing and wearing a ski mask. Mrs. Smith, Simpson, and others testified about how the line up was conducted. The juvenile court obviously accepted the testimony of Mrs. Smith and Officer Simpson:

Officer Simpson:
[Mrs. Smith] ... requested that she have a closer look [at persons] three and five [S.B.].... I requested [these two] to come closer to the glass which they did.... For several minutes she looked at both .... if I'm not mistaken her first statement was that's him.... She requested... to hear the voice of both ... and I arranged that.... I asked Mrs. Smith what she would like for them to say and she said give me your money.... [Her reaction when number five spoke] was nervous, extremely nervous. When she heard ... [S.B.] she said that's him that's him and became extremely nervous.

(Our emphasis.)

Mrs. Smith:
[I couldn't identify anyone in the line up]... just by looking at them. I had to hear their voice. I had two picked out. And after I heard their voice I picked him [S.B.] out instantly .... [there was in my mind] No doubt at all [that it was the same voice [I] heard at the time of the robbery...].
Q: Is there any doubt in your mind today that it was the same voice?

*1126 A: None at all. ...

Q: Did you indicate to Officer Simpson which one you had selected?
A: ... Yes sir. I told him after I heard their voices which one it was.

Q: And then have you seen that person at a later time to know him and identify him, Mrs. Smith?
A: He's in the courtroom ... It's [S.B.] that gentleman right there.. wearing a black coat with a brown collar ... a mingled shirt.
(Our emphasis.)
On cross-examination Mrs. Smith said that she asked Officer Simpson to have the two persons she selected from the line up to both "walk" and "talk" for her: "I wanted to make sure and I said can I see them walk and can I hear them say anything...." The two persons then walked from their position before the glass and went behind a door. Mrs. Smith continued: "I stood over [by] the door and they stood right at the door with it cracked open and then the first one said something and I said no that's not him. And then the other one [S.B.] said something and I said that's him. And Mr. Simpson asked me was I sure and I said I'm positive. No question about it."
Q: ... did you tell ... Mr. Simpson ... that you had selected the right person? ...
A: I said that's him. The minute [S.B.] spoke I told them, that's him.
Mrs. Smith acknowledged her testimony that the robber "appeared [to her at the time of the robbery] to be somewhat bigger [than S.B.]," but said she had initially "estimated" for Officer Simpson that the robber was "about six foot, a hundred and sixty pounds." S.B. was six foot, "about" 125 pounds. She said "I probably told [Officer Simpson] I wasn't sure.... He wasn't two hundred...." Simpson wrote in his early report that she described the robber as weighing 250 pounds!
The court asked Mrs. Smith about her identification of "that voice" she identified at the line up as being the voice of the person that robbed her. She responded: "No doubt. That I can swear to. That was him."
Looking at the photograph made from the videotape, Mrs. Smith emphasized that S.B.'s shoulder's appeared wider and that he appeared bigger, because the photo shows him wearing "loose clothes ... a sloppy sweatshirt."
At the line up, all the inmates were dressed about the same. Each participant had similar, but not identical, general physical characteristics. We have no photos of the line up in this record. The record, when viewed in the light most favorable to the State, does not support S.B.'s arguments. The victim's attention at the line up was not unduly focused on S.B. by the officer. We cannot find on this record a substantial likelihood of misidentification. The victim explained that she took her time to make sure she didn't accuse the wrong person.

Sufficiency of Evidence
In a juvenile delinquency proceeding, the state's burden of proof is the same as in a juvenile proceeding against an adultto prove beyond a reasonable doubt every element of the offense alleged in the petition. La. Ch.C. art. 883; State in Interest of J.W., 597 So.2d 1056 (La.App. 2d Cir.1992).
In a juvenile case, the reviewing court is constitutionally compelled to review both the facts and the law. La. Const. Art. 5, Section 10(A) and (B). Even so, the reviewing court recognizes that the juvenile judge observes the conduct and demeanor of the witnesses and is thus in a far better position to determine credibility and weigh the evidence. Accordingly, we give great deference to the juvenile court's factual findings and credibility determinations and assessment of the weight of particular testimony. See State v. LeBlanc, 213 La. 404, 34 So.2d 905 (1948); State in Interest of J.W., supra, State in Interest of Givens, 350 So.2d 295 (La.App. 3d Cir.1977); State in Interest of D.S., 29,554 (La.App.2d Cir.5/7/97), 694 So.2d 565.
Positive identification by only one witness may be sufficient to support a defendant's conviction. State v. Miller, 561 So.2d 892 (La.App. 2d Cir.), writ denied, 566 So.2d 983 (1990); State v. Davis, 27,961 (La.App.2d *1127 Cir.4/8/96), 672 So.2d 428; State v. Royal, 527 So.2d 1083 (La.App. 1st Cir.), writ denied, 533 So.2d 15 (1988). Voice identification is also reliable and sufficient. See State v. Colvin, 494 So.2d 1357 (La.App. 2d Cir. 1986).
In cases involving a defendant's claim that he was not the person who committed the crime, the rationale of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct., 2781, 61 L.Ed.2d 560 (1979), requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Brady, 414 So.2d 364 (La.1982); State v. Baker, 28,152 (La.App.2d Cir.5/8/96), 674 So.2d 1108.
The robber used a pistol in the robbery, telling Mrs. Smith, "give me your money ... don't make me shoot you." Mrs. Smith testified she opened the cash register and gave him cash of about $300. This evidence fulfills the elements of taking something of value belonging to another from the person of another by use of force or intimidation while armed with a dangerous weapon. La. R.S. 14:64. The question is not whether armed robbery was proved, but whether the identity of the robber was proved beyond a reasonable doubt.
As quoted and summarized above, Mrs. Smith identified S.B. as the robber "instantly" when she heard his voice at the line up and when she saw him during the trial. In response to repeated questions, even by the court, she said there was no doubt in her mind at the line up or at trial that S.B. was the robber. She acknowledged that S.B. in person had white in his eyes and that he did not look "quite as large as the one that robbed me ... his shoulders does [sic] not look as broad. Of course, it may be what he was wearing. I don't know."
To the court's final question of whether Mrs. Smith had any doubt in her mind that the person whose voice she identified at the line up was the robber, Mrs. Smith answered: "That was him ... No doubt. That I can swear to."
Finding the state had proved S.B.'s identity beyond a reasonable doubt, the court reasoned:
After hearing all the witnesses, the witness to me that has the most weight, the most candor and most credibility is Mrs. Smith. And I'm satisfied that although she had great difficulty perhaps as all of us would trying to articulate subtleties she was absolutely, as she said 100% sure about the identification of the voice. She said there was no question in her mind that the voice that she identified at the line up was the voice of the perpetrator. She further stated today that she was 60% certain without the voice, just based on the eyes and on the demeanor and the movement of the defendant that it was him. When I consider all of that the totality of the circumstances her testimony is what I find to be most convincing and for that reason, I'm going to find the juvenile guilty of the crime of aggravof armed robbery.

CONCLUSION
We find no error or abuse of the court's discretion. We find no legal infirmities in the line up. The evidence is legally sufficient to convict beyond a reasonable doubt.
The disposition, essentially of four years for this juvenile who was about 17 years old at the time of the armed robbery, when his circumstances and the circumstances of this conduct are considered, is not excessive. S.B. deliberately concealed his face and person, wearing dark, loose and heavy clothing and a mask, armed himself with a pistol and sneaked out of his home while his alibi witness was asleep and committed the armed robbery at 3:00 a.m. This circumstance strongly indicates that his crime was not a mere spur of the moment idea or a lark, but a deliberate and planned venture to avoid being apprehended.
The disposition is not needless or purposeless and does not shock our conscience.

DECREE
The adjudication and the disposition are
AFFIRMED.